UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| URBAN 8 FOX LAKE CORPORATION, | ) | |
| an Illinois corporation, and URBAN 8 ZION | ) | |
| CORPORATION, an Illinois corporation, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| NATIONWIDE AFFORDABLE HOUSING | ) | Jury Trial Demanded |
| FUND 4, LLC, an Ohio limited liability company, | ) | |
| SCDC, LLC, an Ohio limited liability company, | ) | **(REDACTED VERSION)** |
| and WENTWOOD CAPITAL ADVISORS, LP, | ) | |
| a Texas limited partnership, | ) | **(MOTION FOR LEAVE TO FILE** |
| | ) | **UNDREDACTED VERSION** |
| Defendants. | ) | **UNDER SEAL PENDING)** |

## COMPLAINT

Plaintiffs Urban 8 Fox Lake Corporation ("Fox Lake General Partner") and Urban 8 Zion

Corporation ("Zion General Partner") (collectively, Fox Lake General Partner and Zion General

Partner are referred to as "General Partners"), for their Complaint against Defendants

Nationwide Affordable Housing Fund 4, LLC as successor to Provident Tax Credit Fund VII,

LLC ("Investor Limited Partner" or "ILP"), SCDC, LLC ("Special Limited Partner" or "SLP")

(collectively, the ILP and SLP are referred to as "Limited Partners"), and Wentwood Capital

Advisors, LP ("Wentwood") state and allege as follows:

## INTRODUCTION

1.      In 2000, Urban Zion Limited Partnership (the "Zion Partnership") was formed for

the purpose of acquiring, rehabilitating, developing, owning, and operating a 80-unit affordable

housing development for elderly low-income residents known as Carmel House Apartments (the

"Zion Project").

2.    The Zion Project is located in Zion, which is in Lake County, Illinois, and provides housing for low-income elderly residents under both a restrictive covenant with the State of Illinois and a federal Housing Assistance Payment ("HAP") contract.

3.    The Zion General Partner, Urban 8 Limited Partnership (the "Class A LP"), SLP, and a predecessor to the ILP executed an Agreement of Limited Partnership (the "Zion Partnership Agreement"), dated as of June 1, 2001, providing for the operation of the Zion Partnership.  A true and correct copy of the Zion Partnership Agreement (including exhibits thereto) is attached hereto as **Exhibit A**.

4.    Urban 8 Zion Corporation is the managing general partner of the Zion Partnership.  Urban 8 Limited Partnership is the Class A Limited Partner.  The Zion General Partner and Class A LP are affiliates that share common ownership.

5.    In 2000, Urban Fox Lake Limited Partnership (the "Fox Lake Partnership") was formed for the purpose of acquiring, rehabilitating, developing, owning, and operating a 104-unit affordable housing development for elderly low-income residents known as Lakeland Apartments (the "Fox Lake Project").

6.    The Fox Lake Project is located in the Village of Fox Lake, which is in Lake County, Illinois, and provides housing for low-income elderly residents under both a restrictive covenant with the State of Illinois and a federal HAP contract.

7.    The Fox Lake General Partner, Class A LP, SLP, and a predecessor to the ILP executed an Agreement of Limited Partnership (the "Fox Lake Partnership Agreement"), dated as of June 1, 2001, providing for the operation of the Fox Lake Partnership.  A true and correct copy of the Fox Lake Partnership Agreement (including exhibits thereto) is attached hereto as **Exhibit B**.

8.      Urban 8 Fox Lake Corporation is the managing general partner of the Fox Lake Partnership.  Urban 8 Limited Partnership is the Class A Limited Partner.  The Fox Lake General Partner and Class A LP are affiliates that share common ownership.

9.      Provident Tax Credit Fund VII, L.P., was the original Investor Limited Partner of both Partnerships.  On information and belief, the interests of Provident Tax Credit Fund VII, LP, were acquired by Nationwide Affordable Housing Fund 4, LLC, which is the current Investor Limited Partner of both Partnerships.

10.     SCDC, LLC, is the Special Limited Partner of both Partnerships.

11.     On information and belief, Wentwood Capital Advisors, L.P. ("Wentwood"), currently manages the ILP's interests in the Partnerships.

12.     On information and belief, Wentwood acquired in 2012 and currently owns 100% of the equity interests in and obligations owed by the SLP.

13.     For more than fifteen years, the parties to this action operated under the belief that their contracts permitted the ILP to receive numerous tax credits and other economic benefits, and accordingly granted the General Partners, or their assigns, an option to purchase Defendants' interests in the Partnership at the conclusion of the 15-year compliance period.  The General Partners have satisfied all conditions precedent and properly exercised their options.

14.     After Wentwood acquired managing interests in the ILP and equity interests in the SLP, Wentwood raised a dispute with the General Partners.

15.     In order to, among other things, resolve the dispute between the General Partners and Wentwood, to avoid the costs and expenses associated with litigation, and to assure a clear path forward for the General Partners to acquire the interests of the Limited Partners, █████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████

17.     Now that the ILP has received all of the tax credits, with no recapture risk, and realized the full benefit of them and the full benefit of its bargain, and now that each General Partner has duly exercised its option to purchase Limited Partners' interests in the Partnerships, Defendants are refusing to honor the General Partners' exercise of the purchase options, breaching the Partnership Agreements, ████████████████████ refusing to work or cooperate in good faith with the General Partners in their exercise of the purchase options, and are frustrating and preventing the General Partners' contractual rights and ability to purchase Defendants' interests in the Partnerships and are causing harm to the properties and the General Partner.

18.     Because the General Partners have properly exercised their respective options to acquire the Limited Partners' interests in the Partnerships, and because Defendants are bound to comply with the terms of the Partnership Agreements (which were drafted by the Limited Partners, or their predecessors) and ██████████████████ and cooperate in the purchase, but are refusing to do so, the General Partners bring this action seeking, among other things, to protect and enforce their rights and obtain, among other things, specific performance and damages.

## PARTIES

19.     Urban 8 Zion Corporation is the General Partner of Urban Zion Limited Partnership.  Urban 8 Zion Corporation's principal place of business is located at 770 Lake Cook Road, #350, Deerfield, IL 60015.

20.     Urban 8 Fox Lake Corporation is the General Partner of Urban Fox Lake Limited Partnership.  Urban 8 Fox Lake Corporation's principal place of business is located at 770 Lake Cook Road, #350, Deerfield, IL 60015.

21.     Urban 8 Limited Partnership is the Class A Limited Partner of both the Urban Zion Limited Partnership and the Urban Fox Lake Limited Partnership.  Urban 8 Limited Partnership's principal place of business is located at 770 Lake Cook Road, #350, Deerfield, IL 60015.

22.     Nationwide Affordable Housing Fund 4, LLC, is the current and successor Investor Limited Partner of both Partnerships.  Nationwide Affordable Housing Fund 4, LLC, is an Ohio limited liability company, whose principal place of business is located at 515 South Capital of Texas Highway, Suite 103, Austin, Texas 78746.   On information and belief, Nationwide Affordable Housing Fund 4, LLC has two members: (1) the managing member is Wentwood ORC Advisors, LLC, an Ohio limited liability company and an affiliate of Wentwood Capital Advisors, LP, whose principal place of business is located at 515 South Capital of Texas Highway, Suite 103, Austin, Texas 78746; and (2) the limited member is Nationwide Mutual Capital, LLC, an Ohio limited liability company with its principal place of business located at One Nationwide Plaza 1-35-09, Columbus, Ohio, 43215.

23.     SCDC, LLC, is the Special Limited Partner of both Partnerships.  SCDC, LLC, is an Ohio limited liability company, whose principal place of business is located at 515 South Capital of Texas Highway, Suite 103, Austin, Texas 78746.  On information and belief, SCDC,

LLC's sole member is Wentwood Capital Advisors, LP, a Texas limited Partnership whose principal place of business is located at 515 South Capital of Texas Highway, Suite 103, Austin, Texas 78746.

24.     Urban Zion Limited Partnership is an Illinois limited partnership that was organized solely to acquire, rehabilitate, develop, improve, own, maintain, operate, manage, lease, sell, and otherwise deal with the Zion Project. The Zion Partnership's principal place of business is located at 770 Lake Cook Road, #350, Deerfield, IL 60015.

25.     Urban Fox Lake Limited Partnership is an Illinois limited partnership that was organized solely to acquire, rehabilitate, develop, improve, own, maintain, operate, manage, lease, sell, and otherwise deal with the Fox Lake Project. The Fox Lake Partnership's principal place of business is located at 770 Lake Cook Road, #350, Deerfield, IL 60015.

26.     Wentwood Capital Advisors, L.P., is a Texas limited partnership. Wentwood provides asset management and other services to corporate investors and related companies on low-income housing tax credit equity investments, reportedly managing $7 billion in investments in 47 tax credit funds. Wentwood also reportedly owns and/or manages thousands of units in multifamily properties across 42 states and acts as a property management agent. Upon information and belief, Wentwood is the contractual asset manager for the Limited Partners and is the Limited Partners' agent. Wentwood's principal place of business is 515 South Capital of Texas Highway, Suite 103, Austin, Texas 78746.

## JURISDICTION, VENUE, AND CHOICE OF LAW

27.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between all Plaintiffs and all Defendants, and the amount in controversy exceeds $75,000 for each Plaintiff.

28.     Jurisdiction and venue are proper in this Court because in the Partnership Agreements, the parties agreed that any suit arising from the Partnership Agreements could be brought in the United States District Court for the Northern District of Illinois, and the parties consented to jurisdiction in this Court. ██████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████

29.     In addition, the Partnership Agreements ████████████████████████████ ████████████████████████████████████ shall be construed and enforced in accordance with the laws of the State of Illinois.

## ALLEGATIONS

### I.      The Low-Income Housing Tax Credit Program.

30.     The low-income housing tax credit ("Tax Credit") is a federal tax credit that is generated from certain multi-unit housing projects that satisfy a number of requirements, that include, but are not limited to, an agreement by the property owner to only rent certain qualified units to households with incomes below certain qualified limits at rents that do not exceed certain federally-mandated maximums for a period of at least 15 years after the Property is placed in service (the "Compliance Period").

31.     The Tax Credit program is governed by Section 42 of the Code, certain Treasury Regulations, guidance from the Treasury Department and the Internal Revenue Service, and state-specific procedures contained in various documents adopted by designated housing agencies in each state (collectively, the "Tax Credit Rules").

32.     In a typical low-income housing project, the project owner is organized as a limited partnership or limited liability company, the managing general partner owns a de minimis interest in the fee owner entity but controls the day-to-day operations of the project, and a third-

party tax credit investor is admitted as an investor limited partner, agreeing to contribute capital to the owner entity in exchange for an allocation of substantially all of the Tax Credits available to the project owner and certain other expected tax benefits.

33.     The Tax Credit Rules provide that only the project owner of a qualified low-income housing project can qualify for and receive Tax Credits, and only if the project owner meets certain terms and conditions and guarantees the continuation of these requirements for the duration of the Compliance Period, or as extended.

34.     The project owner collects the Tax Credits over a ten-year period, but remains obligated to maintain the low-income rents during the fifteen-year Compliance Period.  By the end of the Compliance Period, the project owner has collected all Tax Credits available to the project and other tax benefits. As a result, by the end of the Compliance Period, the investor limited partner has realized the vast majority of economic benefits it bargained for and expected from the project and further expects to exit the partnership no later than the expiration of the Compliance Period.

35.     A purchase option is often one of the primary economic incentives for the managing general partner in a typical low-income housing project. While the investor limited partner receives a substantial yearly return on its investment over ten years in the form of Tax Credits and other economic benefits, the managing general partner manages the project during the Compliance Period for fees, which are traditionally required to be deferred and paid out from project cash flows, during the Compliance Period. The managing general partner is also the guarantor of the flow of Tax Credits, any negative adjustors, and operating losses, so the managing general partner assumes significant risk in the project. The managing general partner undertakes its investment of time, resources and money, as well as its duties and obligations,

with the expectation that it will have the option and right to acquire the investor limited partner's interest in the operation of the business as a going-concern or acquire the real estate itself at the end of the Compliance Period at a formulaic price. Traditionally, and in these cases, the investor limited partners does not expect, nor project, any cash payment at the exercise of the purchase option. In this case, each General Partner invested in its respective Partnership and dutifully served as the managing general partner with these understandings and expectations.

36.     Without the purchase option, the managing general partner would have much less incentive to participate in the development of low-income housing and would be deprived of an economic right to which the investor limited partner had agreed at the project's inception.

**II.     The Projects and the Partnership Agreements.**

37.     In 2000, the Partnerships were initially organized to acquire, rehabilitate, develop, improve, own, maintain, operate, manage, lease, sell and otherwise deal with the Projects.

38.     The Projects were to be acquired, developed, and operated in such a manner as to qualify for the Tax Credits.

39.     Pursuant to the Partnership Agreements, in 2001 the predecessor to Nationwide Affordable Housing Fund 4, LLC, was admitted to the Partnerships as the Investor Limited Partner and SCDC, LLC was admitted as the Special Limited Partner. The terms of the Partnership Agreements set forth the various obligations and duties of the General Partners and Limited Partners.

40.     The Partnership Agreements include an option for the General Partners to purchase the Limited Partners' interests in the Partnerships as a going-concern following the end of the Compliance Period (the "Purchase Option").

41.     Section 6.16 of the Partnership Agreements provides, in relevant part:

[T]he General Partners shall have the option to purchase the Interest of both the Investor Limited Partner and Special Limited Partner . . . (the "Option") at any time during the period beginning with the expiration of the Compliance Period and ending on the date which is nine (9) months from the expiration of the Compliance Period (the "Option Period"), on the terms and conditions set forth in this Section 6.16. The General Partners shall exercise the Option, if at all, by delivering to such Limited Partners at any time during the period beginning ninety (90) days prior to the expiration of the Compliance Period and ending on the expiration of the Option Period, written notice of such exercise; such notice of exercise shall specify that the Option otherwise is exercised without condition or qualification, subject to the determination of the purchase price in accordance with this Section 6.16. The purchase price for the Interest of the Limited Partners under the Option shall be equal to the cash which would be distributed to the Limited Partners (other than the Class A Limited Partner) pursuant to Section 5.2.B if the Property were then sold to a third party for "Fair Market Value" at the time of the exercise of the Option (less reasonable expenses approved by the Special Limited Partner in connection with such sale and assuming that any applicable Sale Preparation Fee is paid in accordance with Section 5.2B). The Fair Market Value shall be determined as follows: the General Partners and the Special Limited Partner shall each appoint an appraiser; the two appraisers shall then appoint a third appraiser; each of the appraisers shall determine the fair market value of the Property. The Fair Market Value shall be the average of the determinations of the three appraisers. . . . In conducting the appraisal, the appraiser shall take into account any requirements that the Property remain dedicated for the use of low-income households pursuant to any restrictions under any loan agreements and/or regulatory agreements, or otherwise, and shall take into account any tax benefits or other subsidy or financing benefits available with respect to the Property. . . .

42.   Section 6.17 of the Partnership Agreements sets forth the formula for calculating the Sale Preparation Fee. Section 6.17 states, in relevant part:

Upon any sale of the Property or any portion thereof, the Partnership shall pay a sale preparation fee to the Class A Limited Partner (the "Sale Preparation Fee"), in consideration of its services in arranging for and negotiation such sale, in an amount equal to a reasonable and customary real estate sales commission equal applicable to similar properties in the location of the Property at the time of such sale, not to exceed six percent (6%) of the gross sales price of the Property, as provided in Section 5.2B

. . . The Sale Preparation Fee shall be due and payable on a one-time basis only. In addition, if the Class A Limited Partner (or an Affiliate thereof) purchases the Property, (or an interest therein pursuant to Section 6.16), the Sale Preparation Fee shall be allowed as a credit to the purchase price.

43. The Partnership Agreements also require the General Partners to maintain and repair the Projects, using funds in established Replacement Reserves. However, before the General Partners may withdraw funds for repairs, the Special Limited Partner must provide its consent. Section 6.14(B) of the Partnership Agreement states: "Withdrawals from the Replacement Reserve shall be made with the Consent of the Special Limited Partner to fund capital repairs, improvements, replacements and other contingencies for the Property."

**III.** ███████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

**IV.     The Current Dispute.**

46.     The Compliance Period for both Projects has ended.

47.     In accordance with the Purchase Option, the General Partners timely provided the required written notice of exercise of the Purchase Option to the Limited Partners and such exercise had been acknowledged by the Limited Partners.  The General Partners also provided a copy of the appraisals prepared by the appraiser selected by the General Partners pursuant to Section 6.16 of the Partnership Agreements.

48.     Following the General Partners' proper exercise of their respective Purchase Options, the General Partners and Wentwood, on behalf of the Limited Partners, engaged in discussions regarding disagreements over the determination of Fair Market Value and the purchase prices and Wentwood's refusal to comply with the contractual obligations of the Limited Partners.

49.     The parties' disagreements over the Fair Market Value and purchase prices revolve around four primary issues: (1) Wentwood refuses to appoint an independent appraiser to determine the Projects' Fair Market Values; (2) Wentwood refuses to appropriately credit the Sale Preparation Fee to the purchase prices; (3) Wentwood refuses to account for real estate taxes accrued and charged in arrears, though not yet payable, as is a reasonable and customary expense to be deducted from the purchase price for all Illinois transactions; and (4) Wentwood refuses to approve funding for necessary repairs at the Projects, thereby artificially inflating the ILP's capital account and harming not only the General Partners and the Partnerships, but also the elderly low-income residents of the Projects.

50.     The Partnership Agreements require the Limited Partners to appoint an appraiser to determine the Fair Market Value of the Projects ████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████

51.     Despite being contractually required under the Partnership Agreements to appoint an appraiser in order to complete the determination of the purchase prices pursuant to the Purchase Options, ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████,

Wentwood, on behalf of the Limited Partners, has unjustifiably refused to either appoint an appraiser or accept the General Partners' appraisals and calculations of the purchase prices. Instead, Wentwood has submitted an artificially-high Broker's Opinion of Value ("BOV") in an attempt to inflate the purchase price.

52.     Upon information and belief, this course of conduct is a pattern replicated by Wentwood throughout the LIHTC industry in which it has inserted itself in recent years for the express purpose of depriving general partners or managing members from achieving the negotiated rights and benefits set-forth in their agreements with the ILP and Wentwood's predecessors. Here, Wentwood is trying to, among other things, reinterpret and inflate the "Fair Market Value," inflate the ILP's capital account, and is misconstruing the terms of the Partnership Agreements in an attempt to maximize its own cash return on the impending capital transactions.  Specifically, because Wentwood, on behalf of the Limited Partners, seeks to receive distributions of amounts based upon inflated Fair Market Values and the ILP's inflated positive capital accounts plus twenty percent of any remaining cash following the sale of the

Limited Partners' interests, Wentwood is refusing to account for or approve repairs that would reduce reserves specifically set aside for these repairs and impact the ILP's capital accounts, and is pressing purchase prices for the Limited Partners' interests that are wildly inflated.

53.     To that end, Wentwood has provided to the General Partners its own BOV for each Project and refused to participate in the mandated appraisal process.  A BOV differs from an appraisal in several important ways.

54.     First, the purpose of a BOV is to suggest a range of prices at which to market the property for potential sale to third-parties, while the purpose of an appraisal is to determine an asset's true independent value.

55.     Second, while an appraisal is conducted by an independent, licensed appraiser, a BOV is prepared by a non-independent broker that has a financial interest to, among other things, suggest an inflated sale price and "list" the asset to receive a commission.  In fact, most BOVs are prepared at no charge as an incentive to retain the Broker for listing purposes.

56.     Third, an appraisal is typically more thorough than a BOV and often takes into account certain expenses, physical conditions and other capital needs that a BOV may not.

57.     Fourth, while an appraisal provides a single valuation, a BOV provides a range of possible sales prices, including a "high," a "low," and a "strike price" identified in the middle, essentially predicting the property could sell for any price within a wide range.

58.     Although an appraisal—not a BOV—is contractually required, Wentwood insists that the General Partner agree to a BOV and that each Project be valued based upon a BOV with the highest value suggested in that BOV's range of values.

59.     In an effort to complete the purchase of the Limited Partners' interests and avoid further litigation, the General Partners agreed to consider the BOVs, and informed Wentwood

that the General Partners were willing to accept the "strike price" in the middle of the price range set forth in the BOVs. Wentwood rejected the General Partner's offer to accept the "strike price," instead insisting that the highest value presented in the BOVs be used to calculate the Fair Market Value of each Project.

60.     The parties therefore disagree regarding the proper valuation of the Projects for the purpose of calculating the purchase price. Because the parties cannot reach agreement on the valuation, it is essential that Wentwood comply with its contractual obligations and appoint an appraiser so that the valuation can be completed in accordance with the contract terms. Wentwood refuses and stands in breach of both the Partnership Agreements ████████ ████████, receiving benefits for itself while depriving the General Partners of their bargained-for benefits.

61.     In addition to refusing to appoint an appraiser, Wentwood also refuses to properly credit the Sale Preparation Fee against the purchase price for the Limited Partners' interests in the Partnerships.

62.     Wentwood unjustifiably claims that there is no provision in the Partnership Agreements that permits the Sale Preparation Fee to be deducted from the purchase price of the Limited Partners' interest in accordance with the Purchase Option. The purchase price is defined in Section 6.16 as "equal to the cash which would be distributed to the Limited Partners (other than the Class A Limited Partner) pursuant to Section 5.2B if the Property were then sold to a third party for 'Fair Market Value' at the time of the exercise of the Option (less reasonable expenses approved by the Special Limited Partner in connection with such sale and assuming that any applicable Sale Preparation Fee is paid in accordance with Section 5.2B." Section 6.17 of the Partnership Agreements is clear and provides that, as long as the Class A LP, or an

affiliate such as the General Partners, purchases the Project "(or an interest therein pursuant to 6.16), the Sale Preparation Fee shall be allowed as a credit to the purchase price."

63.     Wentwood also refuses to properly account for current real estate taxes paid in arrears, and other liabilities, in coming to the purchase price for Defendants' interests in the Partnerships.

64.     In Illinois, real estate taxes are paid in arrears (*i.e.*, 2018 taxes are paid in 2019). Therefore, accrued but unpaid real estate taxes are liabilities to the Partnerships and must be deducted from the purchase price (as was done on the acquisition), yet Wentwood insists on including real estate tax reserves as an asset attributable to its benefit.

65.     As a result of Wentwood's conduct with regard to the valuation of the Projects and calculations of the purchase prices in accordance with the Partnership Agreements, Wentwood contends that the purchase price for its interest in Fox Lake should be $793,678, and the purchase price for its interest in Zion should be $885,896.

66.     In reality, however, if the Fair Market Value and purchase price are calculated pursuant to the Partnership Agreements, the resulting purchase price would be substantially lower than Wentwood's demand.  Indeed, while the Partnership Agreements require use of an appraisal, even the use of the "strike price" from Wentwood's own BOVs results in a purchase price of $190,992 for the interests in Fox Lake and $446,045 for the interest in Zion, prior to deductions for required maintenance, repairs, and other costs at the Projects.  However, these prices are subject to reduction following the submission of the two additional appraisals required by each Partnership Agreement, and after deducting the costs of required repairs currently in progress; even though independent parties have identified current repair requirements, Wentwood has insisted that these costs be excluded from the calculation of Fair Market Value,

yet include the same reserves established to cover these capital expenses as another asset, which it insists be added to its benefit. To be clear, the purchase prices for the Limited Partners' interests in Fox Lake Partnership and Zion Partnership are less than $190,992 and $446,045, respectively.

67. A true and correct copy of an e-mail string summarizing the parties' most recent discussions regarding these disagreements is attached hereto as **Exhibit D**.

68. Finally, Wentwood refuses to approve funding for necessary repairs at the Projects. The General Partners have provided documentation to Wentwood supporting the General Partners' request for consent to withdraw funds from the Replacement Reserves, including third-party reports and evaluations confirming that the repairs are necessary. The General Partners have also explained that a number of the required repairs present significant safety issues. Wentwood initially promised to review and address the General Partners' requests by early August, but have yet to respond. On information and belief, Wentwood intends to withhold its consent. A true and correct copy of an e-mail string summarizing the parties' recent discussions regarding required repairs is attached hereto as **Exhibit E**.

69. The Limited Partners' actions, by and through Wentwood, have caused harm to the General Partners and Class A LP, as well as the Projects, the Partnerships, and the elderly low-income residents of the Projects.

70. Further, the Limited Partners and Wentwood have been unjustly enriched by the default and delay in completing the sale of the Limited Partners' interests because the Partnerships have continued to pay down the debt on the Projects and the Limited Partners have received additional fees and cash flow distributions.

17

## LEGAL CLAIMS

### COUNT I: BREACH OF PARTNERSHIP AGREEMENTS
### (Against the ILP and SLP)

71.     Plaintiffs fully incorporate the above paragraphs by reference as if fully stated herein.

72.     The Partnership Agreements are valid and binding contracts.

73.     The Partnership Agreements include a Purchase Option, for which the General Partners provided sufficient consideration.

74.     The General Partners unconditionally exercised their Purchase Options, creating contracts for sale of the Limited Partners' interests in the Partnerships to the General Partners.

75.     The Special Limited Partner is required by each Partnership Agreement to facilitate the sale of the Limited Partners' interests upon each General Partner's exercise of its Purchase Option by appointing a qualified appraiser to provide a determination of the fair market value of the Project and to jointly select, together with the General Partner's appointed appraiser, a third appraiser to also provide a determination of fair market value.

76.     The Special Limited Partner has also unreasonably withheld its consent to withdrawal of funds from the Replacement Reserves to pay for necessary maintenance and repairs at the Projects.

77.     The Special Limited Partner has breached its contractual obligations, including its duty of good faith and fair dealing, by failing to appoint an appraiser and by failing to provide its consent to withdrawals of funds from the Replacement Reserves.

78.     The Limited Partners have breached their contractual obligations, including their implied duties of good faith and fair dealing, to sell their interests in the Partnerships to the General Partners for the purchase price described in the Partnership Agreements by refusing to

appoint an appraiser by refusing to appropriately credit the Sale Preparation Fee and other costs to the purchase price.

79. The Limited Partners breached their contractual obligations, including their duties of good faith and fair dealing, by unjustifiably delaying the sale of their interests to the General Partners.

80. The General Partners are entitled to, among other things, an order for specific performance requiring the Limited Partners to appoint an appraiser for each Project, to transfer their interests to the General Partners in accordance with the terms of the Partnership Agreements, and to approve the withdrawal of funds from the Replacement Reserves to pay for necessary repairs at the Projects.

## COUNT II: ANTICIPATORY BREACH OF PARTNERSHIP AGREEMENTS
### (Against the ILP and SLP)

81. Plaintiffs fully incorporate the above paragraphs by reference as if fully stated herein.

82. The Partnership Agreements are valid and binding contracts.

83. The Partnership Agreements include a Purchase Option, for which the General Partners provided sufficient consideration.

84. Each General Partner unconditionally exercised its Purchase Option, creating a contract for sale of the Limited Partners' interests in each Partnership to the General Partner.

85. The Special Limited Partner is required by the Partnership Agreements to facilitate the sale of the Limited Partners' interests upon the General Partner's exercise of its Purchase Option by appointing a qualified independent appraiser to provide a determination of the fair market value of the Project and to jointly select, together with the General Partner's appointed appraiser, a third appraiser to also provide a determination of fair market value.

86.     The Limited Partners anticipatorily breached their contractual obligations to sell their interests to the General Partners by refusing to cooperate with the exercise of the Purchase Option.

87.     The Special Limited Partner has also unreasonably withheld its consent to withdrawal of funds from the Replacement Reserves to pay for necessary maintenance and repairs at the Projects.

88.     The Special Limited Partner anticipatorily breached its contractual obligation to approve repairs by unreasonably withholding its consent to withdrawal of funds from the Replacement Reserves to pay for necessary maintenance and repairs at the Projects.

89.     The General Partners are entitled to an order for specific performance from this Court requiring the Limited Partners to cooperate with the exercise of the Purchase Option by each General Partner and requiring the Limited Partners to sell their interests to the General Partners in accordance with the terms of the Partnership Agreements.  The General Partners are further entitled to an order for specific performance from this Court requiring the Special Limited Partner to approve the withdrawal of funds from the Replacement Reserves to pay for necessary repairs at the Projects.

**COUNT III:** ███████████████████████
**(Against All Defendants)**

90.     Plaintiff fully incorporates the above paragraphs by reference as if fully stated herein.





**COUNT IV: DECLARATORY JUDGMENT 735 ILCS § 5/2-701**
**(Against All Defendants)**

98.     Plaintiffs fully incorporate the above paragraphs by reference as if fully stated

herein.

99.     An actual controversy exists as to (1) Defendants' contractual obligations to

perform pursuant to the Partnership Agreements ████████████████ (2) the proper

interpretation of the Partnership Agreements with regard to the deduction of the Sale Preparation

Fee from the purchase price; (3) the deduction of accrued, but unpaid, real estate taxes from the purchase price; and (4) the funding of necessary maintenance and repairs at the Projects.

100.    The Partnership Agreements are valid and binding contracts.

101.    The Partnership Agreements include a Purchase Option, for which the General Partners provided sufficient consideration.

102.    Each General Partner unconditionally exercised its Purchase Option, creating a contract for sale of the Limited Partners' interests in each Partnership to the General Partner.

103.    The Special Limited Partner is required by each Partnership Agreement to facilitate the sale of the Limited Partners' interests upon each General Partner's exercise of its Purchase Option by promptly appointing a qualified appraiser to appraise the fair market value of the Project.

104.    The Limited Partners breached their contractual obligations, including their duty of good faith and fair dealing, to sell their interests to the General Partners by unjustifiably delaying and refusing to appoint an appraiser, as required by the Partnership Agreements.



106.    The Special Limited Partner has breached its contractual obligations, including its duty of good faith and fair dealing, by unreasonably withholding its consent to withdrawals of funds from the Replacement Reserves to pay for necessary repairs at the Projects.

107.    Each Partnership Agreement provides that if the Class A LP, or one of its affiliates, purchases the Limited Partners' interests pursuant to an exercise of the Purchase

Option, the Sale Preparation Fee shall be deducted from the purchase price. Each General Partner is an affiliate of the Class A LP. Therefore, the Sale Preparation Fee must be deducted from the purchase price.

108. In Illinois, real estate taxes are paid in the year following the year in which they accrue. Therefore, the accrued, but unpaid, real estate taxes on the Projects for 2018 must be deducted from the purchase price for each Project.

109. Plaintiffs are entitled to a declaration under 735 ILCS § 5/2-701 that:

      a.    Each General Partner's exercise of its Purchase Option is valid and enforceable;

      b.    The Special Limited Partner must promptly appoint an appraiser or, alternatively, provide notice to each General Partner that the Special Limited Partner accepts the General Partner's appraisal;

      c.    The Sale Preparation Fee must be deducted from the purchase price, as defined in the Partnership Agreements, for the Limited Partners' interests in each Project;

      d.    All accrued, but unpaid, real estate taxes on each Project must be deducted from the purchase price for the Limited Partners' interest in such Project; and

      e.    The Special Limited Partner must consent to withdrawal of funds from the Replacement Reserves to pay for necessary maintenance and repairs to the Projects, which must be completed and funded with established reserves for replacement.

## COUNT IV: BREACH OF 805 ILCS § 215/305
### (Against the ILP and SLP)

110. Plaintiffs fully incorporate the above paragraphs by reference as if fully stated herein.

111. Illinois Compiled Statutes Section 215/305 provides that "[a] limited partner shall discharge the duties to the partnership and the other partners under this Act or under the

partnership agreement and exercise any rights consistently with the obligation of good faith and fair dealing."

112.     Plaintiffs and the Limited Partners are partners in the Zion Partnership and/or the Fox Lake Partnership, each an Illinois limited partnership.

113.     The Limited Partners have breached their obligations of good faith and fair dealing by refusing to deal fairly with each General Partner in connection with its exercise of its Purchase Option by, among other things, attempting to frustrate the General Partner's exercise of its Purchase Option and also demanding that the purchase price be determined in a manner that is contrary to the terms of the Partnership Agreement, and attempting to prevent the General Partners from performing necessary maintenance and repairs at the Projects.

114.     The Limited Partners, and their owner/agent Wentwood, have a material conflict of interest in each General Partner's exercise of its Purchase Option because the Limited Partners stand to collect significantly more money from a delay of the purchase and from calculating the Fair Market Value and purchase price in a manner that is contrary to the terms of the Partnership Agreement.

115.     The General Partners are entitled to an order from this Court enforcing each General Partner's exercise of its Purchase Option in accordance with the terms of the Partnership Agreement.

116.     The General Partners are also entitled to an award of damages in connection with the Limited Partners' violations of 805 ILCS § 215/305, in an amount that exceeds $75,000, the precise amount to be determined at trial.

**COUNT V: TORTIOUS INTERFERENCE WITH PARTNERSHIP AGREEMENTS**

**(Against Wentwood)**

117.    Plaintiffs fully incorporate the above paragraphs by reference as if fully stated herein.

118.    The Partnership Agreements are valid and enforceable contracts between the General Partners and the Limited Partners.

119.    Wentwood is aware of the Partnership Agreements and the Limited Partners' duties and obligations thereunder.

120.    Through its ownership and/or management of the Limited Partners, Wentwood intentionally and unjustifiably caused the Limited Partners to breach the Partnership Agreements by, among other things, delaying and refusing to promptly appoint a qualified appraiser to determine the fair market value of the Project, and preventing the Special Limited Partner from facilitating each General Partners' exercise of its Purchase Option.

121.    As a result of Wentwood's tortious interference with the Partnership Agreements, the General Partners have suffered damages.

122.    Each General Partner is entitled to award of damages against Wentwood in an amount exceeding $75,000, the precise amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.      That the Court order specific performance by the Special Limited Partner to promptly appoint an appraiser, or alternatively, to promptly provide notice that the Special Limited Partner accepts each General Partner's appraisal;

2.      That the Court order specific performance of the Limited Partners to sell their interests to the General Partners in accordance with the terms of the Partnership Agreements;

3.      Plaintiffs are entitled to a declaration under 735 ILCS § 5/2-701 that:

a.       Each General Partner's exercise of its Purchase Option is valid and enforceable;

b.       The Special Limited Partner must promptly appoint an appraiser or, alternatively, provide notice to each General Partner that the Special Limited Partner accepts the General Partner's appraisal;

c.       The Sale Preparation Fee must be deducted from the purchase price for the Limited Partners' interest in each Project;

d.       All accrued, but unpaid, real estate taxes on each Project must be deducted from the purchase price for the Limited Partners' interest in such Project; and

e.       The Special Limited Partner must consent to withdrawal of funds from the Replacement Reserves to pay for necessary maintenance and repairs to the Projects, which must be completed and funded with established reserves for replacement.

4.      That the Court order such other and further relief, including, without limitation, monetary relief and attorneys' fees and costs, which the Court may deem just, equitable and appropriate under the circumstances presented.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues triable to a jury.

Dated: September 6, 2018                    Respectfully submitted,

*/s/ Caitlin Martini Mika*
Caitlin Martini Mika
ARNOLD & PORTER
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
Tel: (312) 583-2300
Caitlin.Mika@arnoldporter.com

-and-

David A. Davenport (*pro hac vice pending*)
Christina Rieck Loukas (*pro hac vice pending*)
WINTHROP & WEINSTINE, P.A.

225 South Sixth Street, Suite 3500
Minneapolis, Minnesota 55402
Tel: (612) 604-6400
ddavenport@winthrop.com
cloukas@winthrop.com

*Attorneys for Plaintiffs*

15911587v7

27