# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| URBAN 8 FOX LAKE CORPORATION,<br>URBAN 8 ZION CORPORATION, | ) ) ) | |
| Plaintiffs, | ) ) | No. 18 C 6109 |
| v. | ) ) | Magistrate Judge Jeffrey Cole |
| NATIONWIDE AFFORDABLE HOUSING<br>FUND 4, LLC, SCDC, LLC, WENTWOOD<br>CAPITAL ADVISORS, LP, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

As this case proves, exaggerated and improper claims of attorney-client privilege continue to impermissibly affect discovery specifically and the adversarial process generally. *See the discussion in Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 2018 WL 1804350, at *1 (N.D. Ill. 2018). Unfortunately, such claims are too often indiscriminately applied to "documents that do not truly qualify for protection." *Towne Place Condo. Ass'n v. Philadelphia Indem. Ins. Co.*, 284 F.Supp.3d 889 (N.D. Ill. 2018). *See also Dietz & Watson, Inc. v. Liberty Mut. Ins. Co.*, 2015 WL 2069280, at *6 (E.D. Pa. 2015)*; Falin v. Condo. Ass'n of La Mer Estates, Inc.*, 2012 WL 760831, at *1 (S.D. Fla. 2012); *Employer's Reinsurance Corp. v. Clarendon Nat. Ins. Co.*, 213 F.R.D. 422, 430 (D. Kan. 2003). *See Motorola Solutions, Inc. v. Hytera Corp.*, 2018 WL 1281393 (N.D. Ill. 2018). [Dkt. #128]. Often, the excessive and improper claims are later abandoned when a party is challenged and is required to properly support the claims. But that is too little too late, when viewed from the deterrent purposes of sanctions.

# ARGUMENT

## A.

The defendants, after a couple of, to say the least, missteps, *Urban 8 Fox Lake Corp.*, *supra*, 2019 WL 6208107, have finally submitted a collection of fifty-eight documents, along with the required privilege log, and asked that the court conduct an *in camera* review of those documents to determine whether defendants' claims that they are protected from discovery by the work product doctrine, the attorney-client privilege, or both, are valid. Plaintiffs have lodged challenges to the defendant withholding a number of documents on a handful of grounds. [Dkt. # 129, at 6-8]. As those are the only ones at issue, they will be the only ones reviewed and assessed. *See* Exhibits Nos. 5, 6, 7, 8, 11, 12, 13, 14, 15, 16, 17, 18, 19, 21, 22, 23, 24, 25, 27, 28, 30, 31, 34, 35, 37, 38, 39, 42, 43, 44, 45, 48, 49, 50, 51, 52, 53, 54, 57, 60. After reconsideration of defendants' previous submissions, and review of the present group of documents along with the current version of the defendants' privilege log, the defendants' motion is denied in full. All of the foregoing challenged documents must be produced.

We begin with the undisputed aphorism that the attorney-client privilege is one of the oldest and most widely recognized privileges of confidential communication. *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998). It is intended to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Not all communications between the attorney and the client are privileged; "the privilege is in derogation of the search for the truth and, therefore, must be strictly confined." *In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir.2000). The privilege adheres "only if [the communications] constitute

legal advice, or tend directly or indirectly to reveal the substance of a client confidence." *United States v. Defazio*, 899 F.2d 626, 635 (7th Cir.1990). The attorney-client privilege only shields communications that were intended to be confidential, so communications made to an attorney in the presence of a third party or made with the intent that they will be disclosed to a third party are not privileged. *United States v. Evans*, 113 F.3d 1457, 1462 (7th Cir.1997); *United States v. White*, 950 F.2d 426, 430 (7th Cir.1991). The Seventh Circuit has articulated the following test for determining whether the attorney-client privilege attaches to a communication:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*Evans*, 113 F.3d at 1461 (quoting 8 John Henry Wigmore, Evidence in Trials at Common *217 Law § 2292 (1961)).

The work product doctrine is broader than the attorney-client privilege and protects from discovery "documents and tangible things that are prepared in anticipation of litigation." Fed.R.Civ.P. 26(b)(3)(A); *United States v. Nobles*, 422 U.S. 225, 238 (1975). The work product doctrine shields "material prepared by agents for the attorney as well as those prepared by the attorney himself." *Nobles*, 422 U.S. at 238–39. "The mere fact that litigation does eventually ensue does not, by itself, cloak materials . . . with the work product privilege; the privilege is not that broad." *Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d 1109, 1118 (7th Cir.1983); *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 976 (7th Cir. 1996). To identify work product, courts are directed to determine "whether in light of the factual context the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Logan*, 96 F.3d 971, 976–77

(quoting *Binks*, 709 F.2d at 1119) (internal quotation marks omitted). Materials created in the ordinary course of business which may have the incidental effect of being helpful in litigation are not privileged under the work product doctrine. Fed.R.Civ.P. 26(b)(3) (1970 Committee Notes); *RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209, 217–18 (N.D. Ill. 2013); *Heriot v. Byrne*, 257 F.R.D. 645, 663 (N.D.Ill.2009).

This next bit is important, especially given what we are dealing with, and have been dealing with, in this case. *See the discussion in Urban 8 Fox Corporation*, 2019 WL 6208107 (N.D.Ill. 2019). It cannot be stressed enough that there is no presumption in favor of finding a document to be immune from discovery under either the attorney-client privilege or the work product doctrine. Both evidentiary privileges operate in derogation of the search for the truth and run counter to the public's right to every person's evidence. *Swidler & Berlin v. United States*, 524 U.S. 399, 411 (1998); *United States v. Nixon*, 418 U.S. 683, 709 (1974); *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007); *In re Grand Jury Proceedings (Thullen)*, 220 F.3d 568, 571 (7th Cir. 2000). Accordingly, courts have always construed the privilege narrowly, *Swidler & Berlin*, 524 U.S. at 411, "unless to do so will serve a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Shaffer*, 662 F.3d at 446. The party hoping to withhold evidence from the proceedings – and, to degrees that vary from case to case, thwart the fact-finders' efforts at uncovering the truth – necessarily has the burden of establishing the applicability of the privilege it asserts *on a document-by-document basis*. Blanket claims of privilege are impermissible in all contexts. *Shaffer v. Am. Med. Ass'n*, 662 F.3d 439, 446 (7th Cir. 2011); *Logan*, 96 F.3d at 977; *Binks Mfg.*, 709 F.2d at 1119. The defendants have certainly fallen short of that here.

4

**B.**

"[T]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." *Upjohn*, 499 U.S. at 390–91. Unfortunately, neither the defendants' "Resubmission of Defendants' Privilege Log" [Dkt. # 127] nor their previous try, the "chart" meant to accompany their "Motion for a Protective Order" [Dkt. ## 76, 83], provide much in the way of context for the five dozen or so documents now deposited with the court after the defendants' initial noncompliance. This is surprising, because in the Order of November 13th allowing defendants a chance to "fix" their previous inadequate – and late – privilege log, defendants were directed to comply with *RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209 (N.D. Ill. 2013). [Dkt. # 120, at 10]. There, the court distilled a template for privilege logs from the cases in this district:

> Courts in this district have required that a privilege log identify for each separate document the following information: the date, the author and all recipients, along with their capacities, the subject matter of the document, the purpose for its production and a specific explanation of why the document is privileged. This information must be sufficiently detailed to allow the court to determine whether the party asserting the privilege has discharged its burden of establishing the applicability of the privilege.

291 F.R.D. at 218. Defendants have seemingly ignored that part of the previous Order as well as the applicable case law mentioned in that Order. Defendants' log provides no dates, only sporadically identifies author and capacity, and generally mentions only Mr. Brandstetter – defendants' in-house counsel– as recipient despite most documents having multiple recipients.

Plaintiff understandably argues that these deficiencies constitute a waiver as to the claims of protection for all the documents. Plaintiff has a point. Plaintiffs are supposed to be able to "assess the claim" of privilege based on the defendants" privilege log, Fed.R. Civ.P. 26(b)(5)(A)(ii), but

without any dates for when documents were created, that's virtually impossible. Especially given that the defendants completely bollixed their first attempt; if a blanket waiver of the privilege should ever be found based on an inadequate or late privilege log, it ought to be found in this case.

But, given the hoary nature of these evidentiary privileges, courts have been hesitant to find such sweeping waivers, however poorly a privilege log has been put together. *See*, e.g., *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 623 (7th Cir. 2010); *Belcastro v. United Airlines, Inc.*, 2019 WL 1651709, at *5 (N.D. Ill. Apr. 17, 2019)(collecting cases); *Monco v. Zoltek Corp.*, 317 F. Supp. 3d 995, 1000 (N.D. Ill. 2018)(collecting cases). And, although one won't usually see an effort as deficient as what we have here, especially after two tries, the court won't go so far as to find a global waiver here. After sifting through the hundreds of pages of documents the court is able to, for the most part, piece the necessary information together. But, of course, the point is that doing so is the advocate's job, not the court's. *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 613 (7th Cir. 2006). Moreover, all of it – the lateness of the first privilege log, the inadequacies of the first privilege log, the inadequacies of the second privilege log, and the ridiculous claims of privilege the first time around, *see Appendix* – all necessarily go into the calculus of our *in camera* review.

Importantly, so does defense counsel's disturbing concession that there was no final review of the documents submitted for *in camera* inspection the first time around. Defendants' attorneys tell the court that they had an outside vendor and staff put together the final submission, and that their assurances were all counsel needed before dumping the mess on the court. [Dkt. #130, at 3-4].[1] Such a claim is unacceptable and contrary to the minimal standards required of counsel advancing

---

[1] The full five binders of documents originally submitted for *in camera* inspection, of course, have been retained as they may be necessary for Judge Rowland's review and to provide her with context should there be any objections to this order.

claims of attorney-client privilege, such a claim is deeply troubling and, if true, contrary to the minimal standards required of counsel seeking to advance a claim of attorney-client privilege. Thus, the defendants don't fare well at all, and plaintiffs ought not be too disappointed that the court doesn't accept their invitation to find a global waiver as the defendants' efforts, or lack thereof, get the plaintiffs to the same place in the end.[2]

---

[2] The defendants have filed a reply brief, to which they attach yet another version of their privilege log (from January 2019) and yet another declaration from attorney, Marc Al. [Dkt. # 130]. But that cannot alone settle the issue. Courts have often looked askance at lawyer's declarations and quite properly have not given them conclusive weight and not felt a question conclusively answered because a lawyer has submitted a declaration. *See, e.g., FTC v. Advocate Health Care Network,* 162 F.Supp.3d 666, 671 (N.D. Ill. 2016); *Tellabs v. Fujitsu,* 283 F.R.D. 374, 378 (N.D. Ill. 2012).

Most of what defendants attempt to explain in the reply brief, of course, ought to have been undertaken in the opening brief – or, actually, in their brief of March 8, 2019. Reply briefs are for replying, *Hussein v. Oshkosh Motor Truck Company,* 816 F.2d 348, 360 (7th Cir. 1987)(Posner, J., concurring); *see also Citizens Against Ruining The Env't v. E.P.A.,* 535 F.3d 670, 675 (7th Cir. 2008); *Electro-Brand, Inc. v. MEM-CE, L.L.C.,* 2018 WL 1189691, at *3 n. 2 (N.D. Ill. 2018)(quoting *Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.,* 249 F.R.D. 530, 536 (N.D. Ill. 2008) ), not for attempting to meet the burden of establishing the privilege and work product on a document-by-document basis that should have come in the opening brief. Accordingly, it should go without saying that points and arguments raised for the first time in defendants' reply brief are waived.

Nevertheless, that being said, even if proper, the reply brief really serves only to further hinder the task of reviewing defendants' documents for them and it obfuscates, rather than illuminates, defendants' claims of privilege. For example, the defendants have impermissibly submitted to the court – for what appears to be the first time, *see* [Dkt. ## 76, 77, 78, 85, 86, 124] – a *third* version of their privilege log or "chart." [Dkt. # 131-1]. If the defendants think the court will assimilate this third try at a privilege log into its review of defendants' second try at an *in camera* submission, they should disabuse themselves of that notion.

Curiously, defense counsel's reply brief tells us that its current submission for *in camera* inspection includes only 49 documents, out of what was originally 58 (presumably, the earlier five-binder submission). [Dkt. # 130, at 1, 3-4]. But the current submission includes Exhibits 5-62, or 58 documents. The log submitted with the current submission notes that claims of privilege are withdrawn for Ex. 20, 26, 47, and 62. [Dkt. # 124, at 10, 13, 24, 32/34]. Claims are withdrawn from a page or two of exhibits 55-59, but maintained as to balance of the exhibit. [Dkt. # 124, at 29-32/34]. For example, in the entry for Ex.55, defendants claim the privilege and work product for pages 4699-4701, but withdraw it for pages 4702-03. [Dkt. # 124, at 29-30/34]. But that leaves Ex. 55 in play, as well as Exs. 56-59, so any way you slice it, it doesn't come out to 49 documents.

(continued...)

In the main, the documents the defendants have submitted appear to pertain to the parties' negotiations regarding the exercise of the Purchase Options and the parties' competing valuations of the properties. These documents appeared to have been created from 2015 through 2017. Obviously, the plaintiffs, seeking to exercise the options, are arguing for lower evaluations than the defendants. While all of the documents seemingly focus on property valuation, a block of them are directed to what defendants felt were overcharges by their property management companies. These overcharges somehow entered into the valuations. None of this is explained by the defendants or placed in the context of the current litigation. [Dkt. # 76, at 8-10; # 124, at 2-3].

In any event, disputes about valuation and overcharges are common and are part of the ordinary course of business. They don't necessarily end up in court, The question becomes whether the financial disagreement during negotiation means that the documents, which were prepared as a part of and to assist in those negotiations, were truly prepared in anticipation of litigation. Or, whether gathering financial information to go back and forth on a purchase price is work in a legal or a business capacity. Importantly, the attorney involved in these exchanges, often no more than peripherally, is in-house counsel. As such, the defendants are "treading in an area of privilege law that is generally recognized to be 'especially difficult,' namely, distinguishing in-house counsels'

---

²(...continued)
To further complicate the already hopelessly complicated proceedings, the defense counsel's reply brief indicates that a number of documents submitted for *in camera* inspection and listed in the privilege log are actually not "at-issue "document[s] that require[] a privilege ruling." [Dkt. # 124, at 5-6, 10-11]. The court is told that this includes, for example, Ex. 5 AMTX-Urban 272-280. [Dkt. # 124, at 5, 10]. But the privilege log lists AMTX-Urban 272-280 and indicates "A/C and W/P" in the "Privilege basis" column. [Dkt. # 124, at 4/34]. Similarly, defendants indicate that Ex. 13 – AMTX-Urban 2380 – is not at issue, but the privilege lists it as withheld on the basis of "A/C/ and W/P." [Dkt. # 124, at 7]. The same conflicting claims are made for a number of other entries. Out of an abundance of caution, and having been misled by defendants' flabbergasting approach throughout this process, the court reviewed all documents submitted that the plaintiffs challenged.

legal advice from their business advice." *Am. Nat. Bank & Tr. Co. of Chicago v. Equitable Life Assur. Soc. of U.S.*, 406 F.3d 867, 879 (7th Cir. 2005); *see also Smith v. Bd. of Education of City of Chicago*, 2019 WL 2525890, at *2 (N.D. Ill. June 19, 2019)(". . . courts presume that where in-house counsel is involved, "the attorney's input is more likely business rather than legal in nature."); *Parneros v. Barnes & Noble, Inc.*, 2019 WL 4891213, at *4 (S.D.N.Y. Oct. 4, 2019)(". . . given that privilege obstructs the truth-finding process and its scope is limited to that which is necessary to achieve its purpose ... the need to apply it cautiously and narrowly is heightened in the case of corporate staff counsel, lest the mere participation of an attorney be used to seal off disclosure."); *In re Cty. of Erie*, 473 F.3d 413, 421 (2nd Cir. 2007)(". . . in-house attorneys are more likely to mix legal and business functions."); *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B*, 230 F.R.D. 398, 411 n. 20 (D.Md.2005) ("While courts state that they do not intend to weaken the privilege [by imposing a "higher burden on in-house counsel to 'clearly demonstrate' " that counsel was giving legal advice], they are mindful that corporate clients could attempt to hide mountains of otherwise discoverable information behind a veil of secrecy by using in-house legal departments as conduits of otherwise unprivileged information.").

While the distinction is not easy to draw, generally speaking, "legal advice, as contrasted with business advice, 'involves the interpretation and application of legal principles to guide future conduct or to assess past conduct'" and "[w]here business and legal advice are intertwined, the legal advice must predominate for the communication to be protected." *BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 326 F.R.D. 176, 181 (N.D. Ill. 2018)(collecting cases). In the main, it must be said that review of the documents at issue here show that financial considerations – how to value properties to get the best financial result in the purchase options – tends toward financial

advice and activity and away from legal. That these documents, even those prepared personally by in-house counsel Mr. Brandstetter, are business documents and not legal ones is underscored by the fact that, in many instances, Mr. Brandstetter, attorney for defendants, is communicating directly with a party he knows to be represented by counsel. *See, e.g., Russell v. Citigroup, Inc.*, 748 F.3d 677, 680 (6th Cir. 2014); *E.E.O.C. v. Univ. of Chicago Med. Ctr.*, 2012 WL 1329171, at *3 (N.D. Ill. Apr. 16, 2012)

Up against all that, the defendants, in their privilege log, tell the court that their in-house counsel, Mr. Brandstetter, "does not make substantive business decisions, . . . [so] [t]hese communications are therefore attorney-client and work product privileged . . . ." "Unfortunately, saying so doesn't make it so." *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir.2010);*Madlock v. WEC Energy Group, Inc.*, 885 F.3d 465, 473 (7th Cir. 2018). *Accord Biestek v. Berryhill*, ⸺ U.S. ⸺, 139 S. Ct. 1148, 1162 (2019). Indeed, recently assertions by lawyers that they are not involved in certain kinds of corporate conduct were proven to be untrue. *See FTC v. Advocate Health Care Network,* 162 F.Supp.3d 666 (N.D.Ill. 2016). *See also Tellabs Operations, Inc. v. Fujitsu Ltd.*, 283 F.R.D. 374, 379 (N.D.Ill. 2012); *Silversun Industries, Inc. v. PPG Industries, Inc.*, 296 F.Supp.3d 936 (N.D.Ill. 2017). Thus, assertions by lawyers in the case based on what they have been told by others, need not be accorded the weight of an encyclical.

While most if not all of the documents submitted for *in camera* review are financial analyses, or discussions about them and about the most advantageous formula to use, defendants tell us that Mr. Brandstetter reviews them for legal accuracy. "[H]e requires staff assistance to prepare analyses due to the small size of the legal department" and, because the financial analyses were prepared at his direction, they are "governed by the work-product privilege." Not necessarily; more of a showing

is required than asserting an attorney requested a document or an analysis. *See, e.g., F.T.C. v. Boehringer Ingelheim Pharm., Inc.*, 778 F.3d 142, 152 (D.C. Cir. 2015)(factual information prepared by non-lawyers, even if requested by lawyers, is not protected from discovery under the work product doctrine as it " does not reveal any insight into counsel's legal impressions or their views of the case.").

But, defendants repeat these assertions, over and over, as though a mantra. But saying so – not even saying so 50 or 60 times – does not make it so. *Guerrero v. BNSF Ry. Co.*, 929 F.3d 926, 929 (7th Cir. 2019); *see, e.g., Valero Energy Corp. v. United States*, 569 F.3d 626, 631 (7th Cir. 2009)("Simply asserting that the documents discuss federal tax issues does not convince us that the district court clearly erred in finding them discoverable."). That is all the more true in this case because these assertions are little different than those the defendants made – tardily – the first time around. [Dkt. # 85]. The Appendix to this decision includes just a handful of examples of documents the defendants previously said were necessary to Mr. Brandstetter providing legal advice, or prepared at his direction in anticipation of litigation. As can be seen, these include blank pages (100s of them), lines (almost as many) and photos of furniture and bathroom fixtures. Again, these are just a few examples of scores, if not hundreds, of pages the defendants told the court were privileged in the first go-round. Obviously, the current submission, and defendants' assertions, must be viewed with a skeptical if not a jaundiced eye. They do not fare well under scrutiny.

Beginning with Ex. 5 – the so-called lead document – one can see that little has changed since that first submission, as the exhibit exemplifies many of the flaws in the defendants' claims of privilege and work product. Exhibit 5 is an email string over one month from November 7, 2017 to December 7, 2017. It starts with an October 31, 2017 balance sheet on the Carmel House from

Mr. Delman, who is plaintiff's president, to Ms. Holtz. Ms. Holtz (left unidentified in the privilege log) attaches it and forwards it to Mr. Sebastien (defendant calls him one of their "business representatives") and cc's that email to Mr. Brandstetter (defendants' in-house counsel) and two other "business representatives." Mr. Brandstetter, while cc'ed on these emails, provides no responses or input whatsoever. The defendant claims that the redacted portions of the email chain – communications among the "business representatives" Ms. Hotlz, Mr. Sebastien, and Ms. Usner regarding the purchase option negotiations – are protected by the attorney-client privilege and the work product doctrine. [Dkt #124, at 4]. The defendants claim that the balance sheet (AMTX-Urban 281-284), compiled by plaintiff's president and sent to Ms. Holtz, is protected by the work product doctrine.

First, the claims as to the lead document email chain were not advanced in the defendants' first "chart", which was tardily submitted about a month after defendants' motion seeking *in camera* review and a ruling upholding their claims of privilege. [Dkt. ##76, 85, at 1]. So, the privilege log was not only late, it didn't claim Exhibit 5 was privileged. The claims regarding Exhibit 5 being protected by both the attorney client privilege and the work product doctrine, then, are brand new and, given the foregoing history, have been waived. *See Surgery Ctr. at 900 N. Michigan Ave., LLC v. Am. Physicians Assurance Corp., Inc.*, 317 F.R.D. 620, 631 (N.D. Ill. 2016)("Arguably, they waived their claim of privilege as to these unidentified documents then and there."); *Baxter International, Inc. v. Becton, Dickinson and Company*, 2019 WL 6258490, at *12 n. 13 (N.D. Ill. Nov. 22, 2019)(forfeiture of work product protection where protection was not asserted in privilege log); *Smith v. Bd. of Education of City of Chicago*, 2019 WL 2525890, at *4 (N.D. Ill. June 19, 2019)(waiver of work product protection where claim not asserted in privilege log); *Rao v. Bd. of*

12

*Trustees of the Univ. of Illinois*, 2016 WL 6124436, at \*7 (N.D. Ill. Oct. 20, 2016)("A timely and adequate privilege log is required by the federal rules, and the failure to serve an adequate and timely privilege log may result in a waiver of any protection from discovery."). This waiver applies to six other documents – Exs. 11, 12, 13, 15, 17, 19, and 46 – that defendant did not include at all in its original claims of privilege and work product, or now claims to be work product for the first time.

Second, defendants don't make a convincing case that either the attorney-client privilege or the work product doctrine apply to the email exchange in Ex. 5 and it is, of course, their burden to do so. *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1119-20 (7th Cir. 1983). Ms. Holtz receives a spreadsheet on value of properties from plaintiff's president. She passes it along co-employee Mr. Sebastien with a number of questions and comments. Mr. Sebastien responds asking, among other things, how many other purchase options they had to go through. Ms. Holtz responds that there are four more, so the negotiating process would be continuing "for a long time." Ms. Usner, who had been cc'ed on the exchange, then chimes in with three additional valuation scenarios. Mr. Sebastien responds, with his opinion on which to use and advising the negotiating team to put Mr. Delman off for a bit. Ms. Holtz then responds with additional analysis for and a question for Mr. Sebastien. The two exchange the email chain twice more, and then Ms. Holtz closes it off, sending Mr. Sebastien her final, proposed response to Mr. Delman. Mr. Brandstetter is cc'ed throughout but, as already indicated, he plays no role. He is never addressed, never asks a question, and never provides any input or instructions.

There is no case to be made that this email exchange is privileged. No one in the chain requests any legal advice from Mr. Brandstetter and he never offers any. *See Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010)(party must show legal advice was sought,

and communication was related to that purpose ); *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007)("Only those communications which 'reflect the lawyer's thinking [or] are made for the purpose of eliciting the lawyer's professional advice or other legal assistance' fall within the privilege.") Email communications do not become protected by attorney client privilege merely because an attorney is cc'd on them. *See, e.g., Liner v. FCA US LLC*, 2019 WL 5258074, at *6 (N.D. Ill. Oct. 17, 2019)(documents "do not become protected by attorney client privilege merely because an attorney requests or reviews them."); *Towne Place Condo. Ass'n v. Philadelphia Indem. Ins. Co.*, 284 F. Supp. 3d 889, 895 (N.D. Ill. 2018) ("Merely communicating with a lawyer or copying a lawyer on an otherwise non-privileged communication, will not transform the non-privileged communication or attachment into a privileged one, even if the otherwise non-privileged communication was at the behest of the lawyer.");*Nucap Indus. Inc. v. Robert Bosch LLC*, 2017 WL 3624084, at *2 (N.D. Ill. Aug. 23, 2017)(". . . copying an attorney does not make a communication privileged, and it is not apparent that the purpose of the email was to solicit legal advice as opposed to business advice."); *Bell Microproducts, Inc. v. Relational Funding Corp.*, 2002 WL 31133195, at *1 (N.D. Ill. 2002)(instruction from an attorney to employees to copy him as a recipient on any emails or documents was not by itself enough to make the document privileged).

As for work product protection, the email exchange concerns negotiations on the value of the properties subject to the purchase options. As the Seventh Circuit has explained, in order to invoke the work product privilege, defendants had to show "the primary motivating purpose behind the creation of a document . . . must be to aid in possible future litigation." *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1119 (7th Cir. 1983). "Materials created in the ordinary course of business which may have the incidental effect of being helpful in litigation are not privileged

under the work product doctrine." *RBS Citizens*, 291 F.R.D. at 217. "The mere fact that litigation does eventually ensue does not, by itself, cloak materials . . . with the work product privilege; the privilege is not that broad." *Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d 1109, 1118 (7th Cir.1983); *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 976 (7th Cir. 1996). The primary motivating purpose behind this exchange was negotiations, not litigation, however unpleasant those negotiations might have been. Indeed, Ms. Holtz even says that negotiations would be ongoing for a long time due to the number of properties.

Finally, and remarkably, the defendants claim that the balance sheet itself (AMTX-Urban 281-284) is protected by the work product doctrine because it was "reviewed for legal accuracy by Mr. Brandstetter against the contractual agreements governing the parties' relationship and used by him to formulate his settlement advice to his clients" and was "specifically put together for Mr. Brandstetter's review." [Dkt. #124, at 5]. The most specious claim, however, is that the balance sheet was a product of Mr. Brandstetter's requirement of "staff assistance." [Dkt. # 124, at 5]. Again, the initial email with the balance sheet attached is from Mr. Delman, plaintiff's president. (AMTX-Urban 0000280). The balance sheet was *prepared by plaintiff's president. Cf. United States v. Nobles*, 422 U.S. 225, 238–39 (1975)(work product doctrine protects "material prepared by *agents* for the attorney . . . ." (Emphasis supplied)); *United States v. Smith*, 502 F.3d 680, 689 (7th Cir. 2007)(". . . the privilege extends to the work of the attorney's agents, not the client's agents."). To assert that it was prepared at the direction of Mr. Brandstetter to a staff member is simply a lie. How can it possibly be the work product of defendant's in-house counsel? If such a claim could possibly hold water, everything ever touched or even merely forwarded to an attorney would be immune from discovery. That's clearly not the case, *see, e.g., McCullough v. Fraternal Order of*

15

*Police, Chicago Lodge 7*, 304 F.R.D. 232, 237 (N.D. Ill. 2014)(". . . simply copying a lawyer on an otherwise nonprivileged communication will not transform the non-privileged document into a privileged one."), and the premise the defendant is advancing is preposterous.[3] Claiming that a balance sheet sent by the other side in a purchase option negotiation is the work product of your in-house counsel is, at best, frivolous and, it inspires a healthy degree of skepticism toward any other claims the defendants make. *See Campbell v. Clarke*, 481 F.3d 967, 969 (7th Cir. 2007)("[Parties] who attempt to deceive federal judges, . . . cannot expect favorable treatment on matters of discretion.

Ex. 6 – This is another 10/31/2017 balance sheet, but for a different building, the Lakeland Apartments. Defendants claim this was attached to the foregoing email as well and, again, was prepared for Mr. Brandstetter's review and is protected from discovery by the work product doctrine. But, again, the claim is ridiculous. It was *prepared by plaintiff's president* and sent to Ms. Hotlz as part of purchase option negotiations. It was the other side's idea of how the properties ought to be evaluated. This is clearly not Mr. Brandstetter's work product, nor that of his staff, not prepared at his instruction. Again, such claims are frivolous at best, and severely undermine the defendants' position as to all five dozen of these documents.

Exs. 7 and 8 – These are two additional spreadsheets that defendants tell us were part of the

---

[3] So patently unacceptable is Mr. Brandstetter's claim that a financial analysis prepared by the president of a company his client is negotiating with is *his* work product and the other company's president is no different than *his* staff that, unsurprisingly, neither the court, nor the plaintiff were able to uncover any case addressing such an unsupportable assertion. On the one hand it is comforting to know that, despite the all-to-common abuse of the attorney client privilege and work product to thwart discovery, *see, e.g., Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, No. 17 C 1973, 2018 WL 1804350, at *1 (N.D. Ill. Apr. 17, 2018); *Towne Place Condo. Ass'n v. Philadelphia Indem. Ins. Co.*, 284 F.Supp.3d 889 (N.D. Ill. 2018). *See also Dietz & Watson, Inc. v. Liberty Mut. Ins. Co.*, 2015 WL 2069280, at *6 (E.D. Pa. 2015), no one has apparently been so audacious before.

attachments to Ms. Holtz's email which means, again, they were *prepared by plaintiff's president* and are obviously not the work product of defendants' in-house counsel.

Ex. 14 – This is an email from Ms. Usner to Mr. Sebastien and Mr. Brandstetter regarding the manner in which the properties subject to the purchase option would be evaluated, with the suggestion that a previous business deal be employed as a template. While Ms. Usner does ask Mr. Sebastien and Brandstetter how they wanted to proceed, by all appearances this is asking for business as opposed to legal advice. *See, e.g., Burdon-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003)("Federal law extends the privilege to communications about legal subjects, and it is hard to see why a business evaluation meets that description."); *United States v. Evans*, 113 F.3d 1457, 1463 (7th Cir. 1997)("When lawyers are consulted as . . . business advisors, . . . . the privilege is inapplicable." (quoting Richard O. Lempert & Stephen A. Saltzburg, A Modern Approach to Evidence (2d ed.1982) at 659–660)); *RBS Citizens*, 291 F.R.D. at 216 (the "privilege is limited to situation in which the attorney is acting as a legal advisor – business and financial advice are not protected."); *Smith v. Bd. of Educaition of City of Chicago*, 2019 WL 2525890, at *1 (N.D. Ill. June 19, 2019). And, as it is part of the ongoing negotiations discussed at length in connection with Ex. 5, *supra*, it is not work product. Ex. 15, which fell into the category of documents for which claims of protection were waived, is merely a duplicate of this email.

Ex. 16 – This document is a financial analysis attached to the email in Ex. 15. The analysis, then, is identical to that regarding Ex. 14. The same goes for Exs. 17 and 18, as defendant suggests. Hence, defendants have failed to establish the documents are either privileged or work product.

Ex. 21– This is another email chain regarding valuations of properties subject to purchase options, and eventual presentation of the "theory" of valuation to the other side. As such, it crosses

17

over the line between legal and business capacity of an attorney to business capacity, and defendant has failed to meet its burden of convincing the court otherwise. *Burdon-Meeks*, 319 F.3d at 899; *Evans*, 113 F.3d at 1463; *RBS Citizens*, 291 F.R.D. at 216; *Smith*, 2019 WL 2525890, at *1. As defendant concedes, the analysis is the same for Exs. 22 and 23, identical Ex. 25, and the attachment, Ex. 24.

Exs. 27 and 28 – These documents which evince Mr. Brandstetter communicating directly with represented parties – Mr. Delman and Mr. Conant – meaning that the communications could not be legal in nature, and therefore, cannot be protected by either the attorney-client privilege or work product doctrine.

Ex. 29 – This document, although authored by Mr. Brandstetter, crosses over to the financial side of the negotiations. As such, defendant has failed to meet its burden of convincing the court it is protected from discovery. *Burdon-Meeks*, 319 F.3d at 899; *Evans*, 113 F.3d at 1463; *RBS Citizens*, 291 F.R.D. at 216; *Smith*, 2019 WL 2525890, at *1.

Ex. 31 – This is a purely financial analysis prepared in connection with the ongoing negotiations and is, accordingly, neither apparently related to legal advice nor work product prepared in anticipation of litigation.

Ex. 33 – Again, this email and attachments deal with valuations of several properties. There is no input from Mr. Brandstetter, nor is he asked for any. He is merely cc'ed. That is not and never has been enough to trigger the privilege.

Ex. 34 – This is another cover email with a financial analysis. Again, Mr. Brandstetter is merely cc'ed and neither provides input nor is asked for any input or advice.

Ex. 35 – This is another cover email with another financial analysis attached. Mr.

Brandstetter is not even cc'ed on this email.

Ex. 37 – This is an email chain in which Mr. Brandstetter asks Ms. Holtz and Ms. Reynolds to check the numbers in some financial information that is part of purchase option negotiations. Again, it is a financial analysis, not legal work.

Exs. 38, 39 – Exhibit 38 is an email from Ms. Holtz to Mr. Brandstetter forwarding yet another set of purely financial data, the attachment to Exhibit 38 and Exhibit 39.

Ex. 42 – This is yet another financial breakdown, of management fees for several properties.

Ex. 43 – This document is identical to Exhibit 39.

Ex. 44 – This is a cover email mentioning an update of management fee analysis, with that analysis attached. Ex. 45 is an additional attached financial analysis. These documents are clearly part of ongoing business negotiations as Ms. Holtz remarks that the other side has been "pestering" her for them.

Ex. 45 – This is another management fee analysis, similar to Exs. 39 and 43.

Ex. 48 – This is an email exchange between Mr. Brandstetter and Mr. Delman, a represented party, so it is obviously neither privileged nor work product. Indeed, in a way, it sums up why defendants have failed to meet their burden of proving that any of these documents are privileged or work product. In the exchange, Mr. Delman asked for defendants' "SLP analysis . . . on a year by year basis." Mr. Brandstetter then forwarded this request to Mr. Sebastien, asking if defendants should let Mr. Delman see the analysis. Mr. Sebastien responded, facetiously, "No, it's a secret." And then explained that, of course Mr. Delman could see it as he would see it eventually anyway. If anything refutes a claim of immunity from discovery, and highlights Mr. Brandstetter's over-expansive view of the privilege and work product doctrine, that exchange certainly does.

Ex. 49 – This is yet another purely financial document, another management fee analysis.

Ex. 50 – This document is an email from Mr. Brandstetter to Ms. Usner covering a draft of a letter from Mr. Brandstetter to Mr. Delman requesting that the general partner collect overcharged management fees. Mr. Brandstetter essentially asks Ms. Usner to proofread the numbers in the letter before it goes out. The fact that Mr. Brandstetter is communicating directly with Mr. Delman underscore the nature of his work on the business, as opposed to the legal, side of his capacities.

Ex. 51 – This document is another such letter from Mr. Brandstetter to Mr. Delman. Defendants claim it, too, was attached to the foregoing email. Again, it cannot be protected by the attorney-client privilege or work product doctrine.

Ex. 53 – This is an email from Ms. Holtz to Mr. Brandstetter asking him to write a letter to the general partners requesting them to collect overcharged management fees. Attached are her calculations of those fees. Again, the subject matter is financial and Mr. Brandstetter is communicating directly to the general partners, not through their counsel. All that leads to the impression that this is not legal work.

Ex. 54 – This is an email from Ms. Holtz to Mr. Brandstetter, forwarding an email and management fee analysis by Ms. Usner, which Ms. Usner had already sent to Mr. Brandstetter at Ms. Holtz's request, but had also cc'ed Ms. Holtz. The document is described in defendants' log as Ms. Usner's response to Mr. Brandstetter's request, although the content of the emails suggest there was no request. In any event, again, it is more a business matter than a legal one.

Ex. 57 – Defendants describe this as Ms. Holtz providing Mr. Brandstetter with valuation analysis, but it is actually an email exchange between Ms. Holtz and Mr. Delman. She then forwards the exchange to Mr. Brandstetter, noting that Mr. Delman is not arguing against the valuation

formula they are using to arrive at property valuations. As such, this is, yet again, financial rather than legal work.

Exs. 60, 61 – These are financial valuation of a handful of properties. Unlike the rest of the documents submitted for the *in camera* review, defendants claim this analysis was prepared for, and at the direction of, outside counsel. But, the document the analyses were attached to, Ex. 58, is an exchange between Mr. Brandstetter and Ms. Holtz. Ms. Hotlz's email indicates that the valuations were attached, not in response to a request from or for use by outside counsel, but for use in negotiations with Nationwide.

In addition to asking that these documents be produced, plaintiffs ask for sanctions. Plaintiffs submit that they have incurred significant expense in these privilege claim proceedings, and seek $20,000 as reimbursement for fees and costs attributable to: (1) counsel's meet-and-confer efforts; (2) counsel's review of defendants' original privilege log; (3) counsel's review of filings in connection with defendants' original motion filed on March 8, 2019; (4) plaintiffs' response to defendants' motion; (5) counsel's review and study of defendants' late-submitted "Chart" (ECF No. 85); (6) counsel's review of defendants' resubmitted privilege log; (7) client conferences and discussions regarding the foregoing; and (8) Plaintiffs' responsive filings to Defendants' resubmitted privilege log.

Of course, invalid claims of privilege are sanctionable, as they serve to withhold from the other side discoverable materials. But generally, "sanctions may only be imposed where a party displays wilfulness, bad faith, or fault." *Am. Nat. Bank & Tr. Co. of Chicago v. Equitable Life Assur. Soc. of U.S.*, 406 F.3d 867, 878–79 (7th Cir. 2005); *Langley v. Union Elec. Co.*, 107 F.3d 510, 514

(7th Cir.1997).[4] Obviously, the defendants' first privilege chart, brief, and claims of privilege, especially when gauged against the documents submitted *in camera*, were all made in bad faith. The same can be said for the second privilege log, which failed to comply with both Fed.R.Civ.P 26(b)(5)(". . . describe the nature of the documents, communications, . . . in a manner that . . . will enable other parties to assess the claim."), and even failed to comply with this court's Order of November 13th, which laid out the format the defendants ought to have employed. [Dkt. # 120, at 10]. Orders and rules exist for manifold reasons. They ensure the fair and expeditious resolution of legal controversies, and require attorneys to organize their cases rather than have the court do it for them. *McCurry v. Kenco Logistics Servs.*, LLC, 942 F.3d 783, 790 (7th Cir. 2019).

It is not enough for an attorney to simply execute a "document dump" and expect an informed *in camera* inspection. But defense counsel could not have possibly even bothered to review the documents they dumped on the court the first time around. The submission – again, there are examples in the *Appendix* – is the *in camera* inspection version of a brief written in gibberish. *McCurry*, "[b]ad writing does not normally warrant sanctions, but we draw the line at gibberish." 942 F.3d at 792. And while they did better the second time around, they still fell short of what it expected by ignoring the court's Order. If that does not constitute wilfulness, fault, and/or bad faith

---

[4] The theory underlying the purposes of any sanction award certainly applies here. Sanctions are generally designed to compensate an injured party for time that was needlessly spent on a particular matter. For discussion of the theory of sanctions generally see *Stephens v. Baker & McKenzie LLP*, 769 F. App'x 362, 365 (7th Cir. 2019); *King v. Fleming*, 899 F.3d 1140, 1156 (10th Cir. 2018); *Ambati v. Reno*, 2 F. App'x 500, 501 (7th Cir. 2001); *Textor v. Board of Regents of Northern Illinois University*, 711 F.2d 1387 (7th Cir. 1983); *Rickels v. City of South Bend, Indiana*, 33 F.3d 785, 786-87 (7th Cir. 1994). *Cf.* "Rule 38 sanctions are designed to compensate the appellee for the time and resources wasted in defending against a plainly baseless appeal. ... a promise 'not to do it again' does not excuse the harm already inflicted." *Brotherhood of Engineers and Trainmen v. Union Pacific Railroad Co.*, _F.3d_ (7th Cir. 2018).

– if that does not warrant sanctions – then there are no teeth to the court's authority to curb discovery abuses.

As such, the court agrees that plaintiff must be recompensed for at least some of the expenses the defendants' actions have visited upon them. The defendants' initial submission of documents for *in camera* inspection cannot be described as having been done in good faith. As the discussions regarding that first go-round amply indicate, *see* [Dkt. ## 120,128, *supra*], much of what the defendants submitted was a waste of time for the plaintiffs and the court. The privilege "chart" was woefully inadequate, and the *in camera* submissions, which of course the plaintiffs were spared having to look at, were often ridiculous. *See, e.g.,* Appendix. Plaintiffs in this case are entitled to fees and costs for any work they did as a result. As for defendants' second try, the privilege log again fails to comply with Fed.R.Civ.P. 26(b)(5)(". . . describe the nature of the documents, communications, . . . in a manner that . . . will enable other parties to assess the claim."), and even fails to comply with this court's order of November 13th, which laid out the format the defendants ought to have employed. [Dkt. # 120, at 10]. As such, the plaintiffs should also recoup any expense incurred through review of that document and compiling, without the proper detail from defendants, their response brief. Obviously, again, the plaintiffs did not have to review the documents submitted *in camera* but, aside from a handful of specious claims, those documents claimed to be privileged or work product could arguably be said to be the result of attorneys "'zealously' protect[ing] documents believed, in good faith, to be within the scope of the privilege," *Am. Nat. Bank*, 406 F.3d at 877–78.

Accordingly, plaintiffs should submit invoices to substantiate the amount of fees *reasonably* incurred in dealing with the two privilege logs, and preparing the portions of the two response briefs

dealing with those privilege log assertions.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 1/13/20

# APPENDIX

| KY | Kentucky |
|----|----------|
| KY | Lexington-Fayette |
| KY | Bowling Green |
| KY | Elizabethtown-Fort Knox |
| KY | Owensboro |
| KY | Louisville/Jefferson County |
| KY | Evansville |
| KY | Cincinnati |
| KY | Clarksville |
| KY | Huntington-Ashland |
| KY | N/A |

| LA | Louisiana |
|----|-----------|
| LA | New Orleans-Metairie |
| LA | Baton Rouge |
| LA | Lafayette |
| LA | Shreveport-Bossier City |
| LA | Houma-Thibodaux |
| LA | Lake Charles |
| LA | Monroe |
| LA | Alexandria |
| LA | Hammond |
| LA | N/A |

| MA | Massachusetts |
|----|---------------|
| MA | Springfield |
| MA | Barnstable Town |
| MA | Pittsfield |
| MA | Worcester |
| MA | Boston-Cambridge-Newton |
| MA | Providence-Warwick |
| MA | N/A |



| | | |
|---|---|---|
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |

| 0 | 0 | 0 | 0 | 0 | 0 |
| --- | --- | --- | --- | --- | --- |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |
| 0 | 0 | 0 | | | 0 |

| 0 | 0 | 0 | | 0 |
| 0 | 0 | 0 | | 0 |
| 0 | 0 | 0 | | 0 |
| 0 | 0 | 0 | | 0 |
| 0 | 0 | 0 | | 0 |
| 0 | 0 | 0 | | 0 |
| 0 | 0 | 0 | | 0 |
| 0 | 0 | 0 | | 0 |
| 0 | 0 | 0 | | 0 |



iod to 5000
to Jan. 1st of the year after the most recent Audit
debt from most recent Audit into cell E21.

## Lookup Table (Current Rate)

| Beg Principal | End Principal | Accrued Interest | Payment | Cumulative. Princ. | Cumulative Int. |
|---|---|---|---|---|---|
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| 81 | 9/1/2023 | 2023 | 0.000% | 0.000% |
|---|---|---|---|---|
| 82 | 10/1/2023 | 2023 | 0.000% | 0.000% |
| 83 | 11/1/2023 | 2023 | 0.000% | 0.000% |
| 84 | 12/1/2023 | 2023 | 0.000% | 0.000% |
| 85 | 1/1/2024 | 2024 | 0.000% | 0.000% |
| 86 | 2/1/2024 | 2024 | 0.000% | 0.000% |
| 87 | 3/1/2024 | 2024 | 0.000% | 0.000% |
| 88 | 4/1/2024 | 2024 | 0.000% | 0.000% |
| 89 | 5/1/2024 | 2024 | 0.000% | 0.000% |
| 90 | 6/1/2024 | 2024 | 0.000% | 0.000% |
| 91 | 7/1/2024 | 2024 | 0.000% | 0.000% |
| 92 | 8/1/2024 | 2024 | 0.000% | 0.000% |
| 93 | 9/1/2024 | 2024 | 0.000% | 0.000% |
| 94 | 10/1/2024 | 2024 | 0.000% | 0.000% |
| 95 | 11/1/2024 | 2024 | 0.000% | 0.000% |
| 96 | 12/1/2024 | 2024 | 0.000% | 0.000% |
| 97 | 1/1/2025 | 2025 | 0.000% | 0.000% |
| 98 | 2/1/2025 | 2025 | 0.000% | 0.000% |
| 99 | 3/1/2025 | 2025 | 0.000% | 0.000% |
| 100 | 4/1/2025 | 2025 | 0.000% | 0.000% |
| 101 | 5/1/2025 | 2025 | 0.000% | 0.000% |
| 102 | 6/1/2025 | 2025 | 0.000% | 0.000% |
| 103 | 7/1/2025 | 2025 | 0.000% | 0.000% |
| 104 | 8/1/2025 | 2025 | 0.000% | 0.000% |
| 105 | 9/1/2025 | 2025 | 0.000% | 0.000% |
| 106 | 10/1/2025 | 2025 | 0.000% | 0.000% |
| 107 | 11/1/2025 | 2025 | 0.000% | 0.000% |
| 108 | 12/1/2025 | 2025 | 0.000% | 0.000% |
| 109 | 1/1/2026 | 2026 | 0.000% | 0.000% |
| 110 | 2/1/2026 | 2026 | 0.000% | 0.000% |
| 111 | 3/1/2026 | 2026 | 0.000% | 0.000% |
| 112 | 4/1/2026 | 2026 | 0.000% | 0.000% |
| 113 | 5/1/2026 | 2026 | 0.000% | 0.000% |
| 114 | 6/1/2026 | 2026 | 0.000% | 0.000% |
| 115 | 7/1/2026 | 2026 | 0.000% | 0.000% |
| 116 | 8/1/2026 | 2026 | 0.000% | 0.000% |
| 117 | 9/1/2026 | 2026 | 0.000% | 0.000% |
| 118 | 10/1/2026 | 2026 | 0.000% | 0.000% |
| 119 | 11/1/2026 | 2026 | 0.000% | 0.000% |
| 120 | 12/1/2026 | 2026 | 0.000% | 0.000% |
| 121 | 1/1/2027 | 2027 | 0.000% | 0.000% |
| 122 | 2/1/2027 | 2027 | 0.000% | 0.000% |
| 123 | 3/1/2027 | 2027 | 0.000% | 0.000% |
| 124 | 4/1/2027 | 2027 | 0.000% | 0.000% |
| 125 | 5/1/2027 | 2027 | 0.000% | 0.000% |
| 126 | 6/1/2027 | 2027 | 0.000% | 0.000% |
| 127 | 7/1/2027 | 2027 | 0.000% | 0.000% |
| 128 | 8/1/2027 | 2027 | 0.000% | 0.000% |
| 129 | 9/1/2027 | 2027 | 0.000% | 0.000% |
| 130 | 10/1/2027 | 2027 | 0.000% | 0.000% |
| 131 | 11/1/2027 | 2027 | 0.000% | 0.000% |
| 132 | 12/1/2027 | 2027 | 0.000% | 0.000% |
| 133 | 1/1/2028 | 2028 | 0.000% | 0.000% |

**Wentwood Capital Advisors, LP**

   

   

   

| | Year to Date Conversions | | | |
|---|---|---|---|---|
| Year | 1-Jan | Tax Day | Tax Day + 1 | 31-Dec |
| 1987 | 1/1/1987 | 4/15/1987 | 4/16/1987 | 12/31/1987 |
| 1988 | 1/1/1988 | 4/15/1988 | 4/16/1988 | 12/31/1988 |
| 1989 | 1/1/1989 | 4/15/1989 | 4/16/1989 | 12/31/1989 |
| 1990 | 1/1/1990 | 4/15/1990 | 4/16/1990 | 12/31/1990 |
| 1991 | 1/1/1991 | 4/15/1991 | 4/16/1991 | 12/31/1991 |
| 1992 | 1/1/1992 | 4/15/1992 | 4/16/1992 | 12/31/1992 |
| 1993 | 1/1/1993 | 4/15/1993 | 4/16/1993 | 12/31/1993 |
| 1994 | 1/1/1994 | 4/15/1994 | 4/16/1994 | 12/31/1994 |
| 1995 | 1/1/1995 | 4/15/1995 | 4/16/1995 | 12/31/1995 |
| 1996 | 1/1/1996 | 4/15/1996 | 4/16/1996 | 12/31/1996 |
| 1997 | 1/1/1997 | 4/15/1997 | 4/16/1997 | 12/31/1997 |
| 1998 | 1/1/1998 | 4/15/1998 | 4/16/1998 | 12/31/1998 |
| 1999 | 1/1/1999 | 4/15/1999 | 4/16/1999 | 12/31/1999 |
| 2000 | 1/1/2000 | 4/15/2000 | 4/16/2000 | 12/31/2000 |
| 2001 | 1/1/2001 | 4/15/2001 | 4/16/2001 | 12/31/2001 |
| 2002 | 1/1/2002 | 4/15/2002 | 4/16/2002 | 12/31/2002 |
| 2003 | 1/1/2003 | 4/15/2003 | 4/16/2003 | 12/31/2003 |
| 2004 | 1/1/2004 | 4/15/2004 | 4/16/2004 | 12/31/2004 |
| 2005 | 1/1/2005 | 4/15/2005 | 4/16/2005 | 12/31/2005 |
| 2006 | 1/1/2006 | 4/15/2006 | 4/16/2006 | 12/31/2006 |
| 2007 | 1/1/2007 | 4/15/2007 | 4/16/2007 | 12/31/2007 |
| 2008 | 1/1/2008 | 4/15/2008 | 4/16/2008 | 12/31/2008 |
| 2009 | 1/1/2009 | 4/15/2009 | 4/16/2009 | 12/31/2009 |
| 2010 | 1/1/2010 | 4/15/2010 | 4/16/2010 | 12/31/2010 |
| 2011 | 1/1/2011 | 4/15/2011 | 4/16/2011 | 12/31/2011 |
| 2012 | 1/1/2012 | 4/15/2012 | 4/16/2012 | 12/31/2012 |
| 2013 | 1/1/2013 | 4/15/2013 | 4/16/2013 | 12/31/2013 |
| 2014 | 1/1/2014 | 4/15/2014 | 4/16/2014 | 12/31/2014 |
| 2015 | 1/1/2015 | 4/15/2015 | 4/16/2015 | 12/31/2015 |
| 2016 | 1/1/2016 | 4/15/2016 | 4/16/2016 | 12/31/2016 |
| 2017 | 1/1/2017 | 4/15/2017 | 4/16/2017 | 12/31/2017 |
| 2018 | 1/1/2018 | 4/15/2018 | 4/16/2018 | 12/31/2018 |
| 2019 | 1/1/2019 | 4/15/2019 | 4/16/2019 | 12/31/2019 |
| 2020 | 1/1/2020 | 4/15/2020 | 4/16/2020 | 12/31/2020 |
| 2021 | 1/1/2021 | 4/15/2021 | 4/16/2021 | 12/31/2021 |
| 2022 | 1/1/2022 | 4/15/2022 | 4/16/2022 | 12/31/2022 |
| 2023 | 1/1/2023 | 4/15/2023 | 4/16/2023 | 12/31/2023 |
| 2024 | 1/1/2024 | 4/15/2024 | 4/16/2024 | 12/31/2024 |
| 2025 | 1/1/2025 | 4/15/2025 | 4/16/2025 | 12/31/2025 |
| 2026 | 1/1/2026 | 4/15/2026 | 4/16/2026 | 12/31/2026 |
| 2027 | 1/1/2027 | 4/15/2027 | 4/16/2027 | 12/31/2027 |

Historical Rates no longer being

through macro

| Start Date | End Date | Total Rate Days |
|---|---|---|
| 01/01/87 | 09/30/87 | 273 |
| 10/01/87 | 12/31/87 | 92 |
| 01/01/88 | 03/31/88 | 91 |
| 04/01/88 | 09/30/88 | 183 |
| 10/01/88 | 03/31/89 | 182 |
| 04/01/89 | 09/30/89 | 183 |
| 10/01/89 | 03/31/91 | 547 |
| 04/01/91 | 12/31/91 | 275 |
| 07/01/11 | 09/30/11 | 92 |
| 10/01/11 | 09/30/14 | 1096 |
| 10/01/14 | Dispo | #VALUE! |